[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14310

_____

THE INDEPENDENT ORDER OF FORESTERS,

Plaintiff-Counter
Defendant,

versus

CATHLEEN GOLD-FOGEL,
individually and as natural guardian for her
minor children, A.F. and M.F.,

Defendant-Counter
Claimant-Appellant,

DAVID FOGEL,

Defendant-Counter
Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:19-cv-80824-AHS

_____

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

ROSENBAUM, Circuit Judge:

Almost fifty years ago, the Supreme Court emphasized the federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976). But in the very same opinion, the Court nonetheless excused a federal court from exercising the jurisdiction given to it, based on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* at 817 (cleaned up), 820-21.

This clash of principles plays out again in this case. That is, the district court here enjoyed jurisdiction but chose not to exercise it and instead stayed the case in favor of parallel state proceedings. We must decide whether it abused its discretion in so doing.

Here, The Independent Order of Foresters ("Foresters") filed an interpleader action concerning the proper disbursement of about $3 million in life-insurance proceeds arising from the death of the insured, Andrew Fogel. Defendant-Appellant Cathleen Gold-Fogel, Andrew's[1] ex-wife, and Defendant-Appellee David Fogel, Andrew's son, advanced competing claims to the money, and Foresters sought in federal court to deposit the funds with the district court and be dismissed from further involvement.[2]

Meanwhile, Cathleen filed what she styled as a counterclaim against Foresters and David in the interpleader action, seeking a declaratory judgment that she was entitled to the life-insurance proceeds. Cathleen claimed the proceeds based on a Marital Settlement Agreement between herself and Andrew, which required Andrew to purchase the life-insurance benefit at issue for alimony and child-support purposes. The Marital Settlement Agreement was part of a state-court divorce proceeding between Cathleen and Andrew, and the Florida state court that presided over the divorce ratified and adopted the Agreement when it dissolve Cathleen and Andrew's marriage.

For his part, David filed a state-court action asserting common-law and Florida state-law claims that Cathleen violated the

---

[1] Because this opinion requires us to discuss three members of this family, to avoid confusion, we refer to them throughout this opinion by their first names.

[2] Foresters did not claim any interest in the stake and is not a party to the present appeal.

4                    Opinion of the Court                    20-14310

Marital Settlement Agreement by failing to pay David child sup-
port. Like Cathleen's federal declaratory-judgment claim, David's
state-law case turns on the meaning of the Marital Settlement
Agreement. So David moved to stay the federal action until reso-
lution of the state-court action that was set to interpret the Agree-
ment.

The district court granted that motion, dismissed Cathleen's
declaratory-judgment claim against Foresters, and stayed the re-
maining action against David while the related state-court litiga-
tion runs its course.

Cathleen appeals the stay. And so we must decide whether
the district court here abused its discretion when it declined to ex-
ercise its given jurisdiction. For reasons we explain below, we con-
clude that it did not.

I.

In connection with their divorce in Florida state court, Cath-
leen and Andrew Fogel entered in a Marital Settlement Agreement
(the "Agreement") in 2010. Section 5 set forth Andrew's child-sup-
port responsibilities.[3] It required Andrew to pay $75,000.00 per

---

[3] Section 5 provides, in full,

> The Husband will pay $75,000.00 per year ($6,250.00
> per month) as and for child support. The parties agree
> that while normally child support would terminate
> pursuant to Florida law when the youngest minor
> child turns 18, or 19 if still in high school, or is emanci-
> pated or dies, the parties agree that based upon the spe-
> cial needs of the minor children (cerebral palsy), that

20-14310          Opinion of the Court          5

year to Cathleen for child support for their children for the rest of the children's lives.[4]

Section 11, entitled Life Insurance, bound Andrew to secure his alimony and child-support obligations with an insurance policy on his life.  Specifically, Andrew was to continue funding two life-insurance policies, which had a total of $4 million in death benefits, that Andrew held at the time he entered into the Agreement.  Section 11 also required Andrew to maintain a life-insurance policy of at least $1 million for an additional 15 years.  Section 11 concluded,

> The beneficiary of said policies shall be the Wife (or the children's guardian's if she Wife should die), and should any funds be received therefrom, the same shall be used for the benefit of the Wife and children.

the minor children will need support from their parents for the rest of their lives, and as such child support in this matter will continue to be paid from the Father to the Mother as long as any of the minor children are alive. Parties further agree that the Father will have the right to request a modification of child support upon his retirement, which shall occur no sooner than the Father's 65th birthday.

[4] Because all the children had cerebral palsy, the child-support obligations did not end when the children reached the age of majority or otherwise became emancipated.

[*sic*].

In compliance with his Agreement obligations, Andrew had a life-insurance policy with Foresters. Upon Andrew's death, the policy had a face value of $3 million. Foresters paid out about $1 million of the proceeds to Cathleen individually before it filed its interpleader complaint in this case. Through that complaint, Foresters sought to obtain an order permitting it to deposit the remaining funds (about $2 million) into the district court's registry and directing Cathleen and David to interplead and settle between themselves their respective claims to the funds.

Not long after Foresters filed suit, Cathleen moved to dismiss Foresters's complaint. A few weeks later, David filed an action against Cathleen in the Circuit Court for the Fifteenth Judicial Circuit of Florida on September 12, 2019. *See In re: David Fogel v. Cathleen Fogel*, No. 50-2019-CP-004383 (the "State-Court Action").

In the State-Court Action, David pled claims for breach of fiduciary duty and unjust enrichment. He also asked the state court to impose a constructive trust on the life-insurance proceeds and order the proceeds be remitted to him. David based his claims, in significant part, on Sections 5 and 11 of the Agreement. Although the state court dismissed David's initial complaint on Cathleen's

motion, he has since filed an amended complaint. Cathleen's motion to dismiss the amended complaint remains pending.[5]

In the meantime, the litigation in the district court continued. Soon after he initiated the State-Court Action, David filed his answer to Foresters's interpleader complaint. He admitted Foresters's allegation that he and Cathleen disagreed as to who was entitled to the death benefits under the policy at issue. And he echoed Foresters's request that the court order Foresters to deposit the funds in the district court so David and Cathleen could settle between themselves their respective rights under the policy.

Cathleen then mooted her motion to dismiss in the federal action by filing an answer (opposing Foresters's request), along with a counterclaim[6] against David and Foresters. The counterclaim sought a declaratory judgment stating that Cathleen was entitled to the life-insurance proceeds.

Cathleen based her alleged entitlement on Section 11 of the Agreement. David, though, contended that Cathleen should not receive the entire amount of the proceeds. Consistent with his claims in the State-Court Action, David asserted that the

---

[5] The state-court docket indicates that Cathleen's motion to dismiss the amended complaint (along with a motion to strike David's prayer for attorney's fees that Cathleen filed the same day) remains pending as of October 20, 2021.

[6] While Cathleen's claim against David might properly be considered a cross-claim, we refer to it as the district court did. The designation does not affect our analysis.

Agreement names her as the beneficiary only in her capacity as the trustee of the child-support monies that the life-insurance policy was meant to secure.  He also argued that Cathleen has been misappropriating child-support funds that were intended for David's benefit.

As the litigation proceeded, Foresters moved to deposit the insurance proceeds with the district court.

While that motion remained pending, as relevant here, David sought (in a renewed motion), among other relief, to stay trial. In support of his motion, David argued that if the district court granted Foresters's request to deposit the funds with the district court—a request that by this point in the litigation was unopposed—then the district court would need only to determine the effect of the Agreement on the parties' entitlement to the funds. Because this issue was already part of the broader State-Court Action concerning child support, David continued, the district court should stay the proceedings under either *Colorado River Water Conservation District v. United States,* 424 U.S. 800 (1976), or *Ameritas Variable Life Insurance Co. v. Roach*, 411 F.3d 1328 (11th Cir. 2005).

Cathleen opposed David's renewed motion to stay, urging that a stay was not appropriate under *Colorado River* or *Ameritas*. Separately, Cathleen indicated her intention to move in the future for summary judgment on her counterclaim for a declaratory judgment.

In response to these developments, the district court issued an order (1) granting Foresters's motion to deposit funds and be

discharged; (2) dismissing with prejudice Cathleen's counterclaim against Foresters; and (3) granting David's (renewed) motion to stay the proceedings.[7]

Cathleen moved for reconsideration of the district court's order. Arguing that the sequence of filing the federal and state actions was important to the propriety of granting a stay, Cathleen pointed out that the order mistakenly said the State-Court Action had been filed in 2018 (before the interpleader action was filed), when it had in fact been filed in 2019 (after the interpleader action was filed). Then she again contended that neither *Colorado River* nor *Ameritas* warranted granting David's motion for a stay. In an order denying Cathleen's motion for reconsideration, the district court acknowledged its error about the year the State-Court Action was filed, but it nonetheless denied Cathleen's request to lift the stay.

Cathleen timely appealed both orders. On appeal, she asserts that the district court abused its discretion by staying the proceedings.

## II.

We review for abuse of discretion the staying of a declaratory-judgment action. *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289-290 (1995)). Under this standard, the district

---

[7] The district court's order also denied as moot a motion Cathleen had filed seeking to place the action on the non-jury calendar.

court enjoys a range of choices, and we will not disturb its decision if the court does not venture beyond this range.  *Id.* at 1330.  And when it comes to declaratory judgment actions specifically, that range is "substantial."  *Wilton*, 515 U.S. at 286 ("[F]ederal courts [have] unique and substantial discretion in deciding whether to declare the rights of litigants.").

Nevertheless, a district court abuses its considerable discretion if it fails to consider a relevant factor that should have been given "significant weight"; conversely, if it considers an irrelevant or improper factor and weighs it significantly in the calculus; or if it accounts for only and all proper factors but, in weighing them, "commits a clear error of judgment."  *Ameritas*, 411 F.3d at 1330 (citation and internal quotation marks omitted).

## III.

We hold that the district court did not abuse its discretion in staying the case until the State-Court Action was resolved.[8]  To explain why, we must discuss the doctrines stemming from *Colorado River* and *Ameritas*.  We begin with *Ameritas*.

---

[8] We enjoy jurisdiction to review this appeal as a "final decision" within the meaning of 28 U.S.C. § 1291.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 8-10 (1983).  Although the district court's decision did not leave it without further involvement in the proceedings—because it still holds the funds Foresters deposited and intends to disburse those funds in accordance with the State-Court Action's adjudication of the parties' entitlement to them—the district court's order was final for these purposes because it required "an essential part of the federal suit to be litigated in a state forum."  *Id.* at 10 n.11 (discussing *Idlewild Liquor Corp. v. Epstein*, 370 U.S. 713 (1962)).

A.  *The district court did not abuse its discretion when it stayed Cathleen's counterclaim that sought a declaratory judgment*

Similar to the situation here, in *Ameritas*, the district court addressed a dispute over insurance.  411 F.3d at 1329-30.  There, Ameritas (the insurer) refused to pay life-insurance proceeds to Roach (the intended beneficiary) because it alleged that the insured's cause of death was not covered under the effective date of the policy.  *Id.*  Ameritas filed suit in federal district court, invoking the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.  *Id.* at 1330.  It sought a declaration of the parties' rights and obligations under the insurance policy.  *Id.*

After Ameritas filed its federal suit, Roach filed a state-court action against Ameritas, as well as against the insurance agent who sold the policy and that agent's employer.  *Id.*  She asserted common-law claims relating to the sale and alleged breach of the contract.  *Id.*  Roach also moved to dismiss the federal case, in light of the state-court action.  *Id.*  The district court granted Roach's motion, and Ameritas appealed.  *Id.*  We affirmed.

In reaching that decision, we noted that the Declaratory Judgment Act—which provides that "any court of the United States . . . *may* declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201(a) (emphasis added)—"is an enabling Act, which confers a discretion on courts rather than an absolute right upon the litigant," *Ameritas*, 441 F.3d at 1330 (quoting *Wilton*, 515 U.S. at 287) (internal quotation marks

omitted). And though the Act empowers federal courts to declare rights, it imposes no duty to do so. *Id.*

Rather, we explained, in cases like *Ameritas*, the Supreme Court has emphasized that "it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *Id.* (quoting *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942)) (internal quotation marks omitted). We stressed the Supreme Court's "warn[ing]" that "gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." *Id.* (quoting *Brillhart*, 316 U.S. at 495) (internal quotation marks and alteration omitted). For these reasons, we observed, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judgment." *Id.* at 1332 (quoting *Wilton*, 515 U.S. at 286) (internal quotation marks omitted).

To guide district courts in evaluating when dismissal or staying of Declaratory Judgment actions under *Ameritas* is appropriate, we set forth a list of nine factors district courts may consider:

> (1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;
> (2) whether the judgment in the federal declaratory action would settle the controversy;

(3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing"—that is, to provide an arena for a race for res judicata or to achieve a federal hearing in a case otherwise not removable;

(5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;

(6) whether there is an alternative remedy that is better or more effective;

(7) whether the underlying factual issues are important to an informed resolution of the case;

(8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Ameritas*, 411 F.3d at 1331.

Although we identified several factors, we cautioned that our list was not necessarily exclusive and that no single factor controls. *Id.* And in *Ameritas* itself, we affirmed the district court's

decision to dismiss the declaratory-judgment action before it even though the district court expressly considered only three of the specific factors we articulated.[9]  *Id.*  In reaching this conclusion, we noted that "the primary factors" of "traditional concepts of federalism, efficiency, and comity" drive the decision.  *Id.* at 1332.

Here, the district court heeded our guidance in *Ameritas* and did not abuse its discretion by staying Cathleen's counterclaim as it relates to David.  After reviewing the parties' briefs and hearing argument, the court noted only one issue remained in the federal suit—who is entitled to the life-insurance proceeds.  That issue, the court correctly observed, turns on questions of state—not federal—law.  Not only that, the court continued, but Cathleen and David were already parties to the State-Court Action, which could effectively resolve the issue.

We agree.  The sole remaining question in the federal litigation—who gets the insurance proceeds—relies entirely on the interpretation of the Agreement, which the state court ratified and adopted when it entered the final judgment dissolving Cathleen and Andrew's marriage.  The interpretation of the Agreement governs Cathleen's responsibilities, if any, concerning use of the life-insurance proceeds to pay child support to David.  Though the

---

[9] There, the district court based its decision on the state-court action's encompassment of the complete controversy; the federal-court action's comparatively limited scope, which included only some of the parties and claims addressed in the state-court action; and a finding that the federal-court action would amount to unnecessary and inappropriate interference with the pending state-court action.  *Ameritas*, 411 F.3d at 1331.

district court could have elected to resolve this issue, states traditionally have a substantial interest in domestic matters and generally enjoy more experience than federal courts in dealing with domestic disputes.  It would also be inefficient—and perhaps worse, if the two courts arrived at inconsistent determinations—for both the federal district court and the state court to address the claims pending in their jurisdiction.

In short, the record reflects that the district court appropriately considered the parties' arguments and applied the *Ameritas* doctrine, even if it did not ultimately address each factor in writing. And based on the facts in the record, we have little trouble concluding that the district court did not abuse its discretion when it stayed Cathleen's counterclaim as it relates to David.

B. *The district court did not abuse its discretion in staying the remaining aspect of the interpleader action under the* Colorado River *doctrine*

With the staying of Cathleen's counterclaim for a declaratory judgment against David and the dismissal against Foresters, that would have left only the interpleader action against David actively pending in the district court.  Because the *Ameritas* doctrine relies on the permissive wording of the Declaratory Judgment Act, and the interpleader statute (28 U.S.C. § 1335) and rule (Fed. R. Civ. P. 22)[10] contain no comparable language, staying Cathleen's

---

[10] Foresters's interpleader complaint expressly invoked federal diversity jurisdiction under 28 U.S.C. § 1332.  Under § 1332, a plaintiff must establish complete diversity between the stakeholder and the claimants (in the absence of

declaratory-judgment claim against David under the *Ameritas* doctrine did not bring the entire case to a halt.

That brings us to the *Colorado River* doctrine, on which the district court relied in part to stay the remaining interpleader action. The *Colorado River* doctrine can apply only when concurrent state and federal litigation exists, and the federal litigation does not qualify for abstention under any of the three traditional abstention doctrines.[11] *Colorado River*, 424 U.S. at 817. When that's the

---

federal-question jurisdiction) and an amount in controversy of at least $75,000. *See Lummis v. White*, 629 F.2d 397, 400-01 (5th Cir. 1980), *rev'd on other grounds sub nom. Cory v. White*, 457 U.S. 85 (1982). The complaint did not refer to Rule 22, which governs the interpleader procedure. But that is the procedural mechanism by which Foresters could pursue its interpleader action based on diversity jurisdiction. *See id.* The interpleader complaint also did not mention 28 U.S.C. § 1335, which provides its own basis for federal jurisdiction in interpleader actions, provided the adverse claimants are minimally diverse (meaning at least two adverse claimants hale from different states) and the amount in controversy is worth at least $500.00. Rule 22 also governs the procedure in interpleader cases brought under § 1335. *See* Fed. R. Civ. P. 22(b). Although Foresters did not invoke § 1335, when a litigant can establish federal jurisdiction under § 1332 for an interpleader action, it can necessarily establish federal jurisdiction under § 1335 because § 1332's jurisdictional requirements are more stringent than those of § 1335.

[11] Generally speaking, abstention in this context is "[a] federal court's relinquishment of jurisdiction when necessary to avoid needless conflict with a state's administration of its own affairs." *Abstention*, Black's Law Dictionary, at 10 (10th ed. 2014). The three traditional forms of abstention to which *Colorado River* refers are known as *Pullman* abstention, *Burford* and *Thibodaux* abstention, and *Younger* abstention. 424 U.S. at 814-15. *Pullman* abstention, named for *Railroad Commission of Texas v. Pullman Co.*, 312 US. 496 (1941), refers to abstention "in cases presenting a federal constitutional issue which

case, principles of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," may allow a federal court not to perform its otherwise "virtually unflagging obligation . . . to exercise the jurisdiction given" it. *Id.* at 817. The circumstances where this may be appropriate are "considerably . . . limited" and "exceptional." *Id.* at 818.

In *Colorado River* and its progeny, the Supreme Court set forth several factors that might warrant a district court's declination to use its jurisdiction when parallel state and federal litigation exists. *See id.*; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). We have described these

---

might be mooted or presented in a different posture by a state court determination of pertinent state law." *Colorado River*, 424 U.S. at 814 (citation and internal quotation marks omitted). *Burford* and *Thibodaux* abstention are named for *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), and *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), respectively. Under that doctrine, "[a]bstention is . . . appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar," or even when the state question itself is not determinative of state policy but the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River*, 424 U.S. at 814. And *Younger* abstention, named for *Younger v. Harris*, 401 U.S. 37 (1971), "is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings, state nuisance proceedings antecedent to a criminal prosecution, which are directed at obtaining the closure of places exhibiting obscene films, or collection of state taxes." *Colorado River*, 424 U.S. at 816 (citation omitted).

factors as follows: (1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, . . . (6) the adequacy of the state court to protect the parties' rights[,]" (7) "the vexatious or reactive nature of either the federal or the state litigation," and (8) "whether the concurrent cases involve a federal statute that evinces a policy favoring abstention." *Ambrosia Coal & Constr. Co. v. Pages Morales*, 368 F.3d 1320, 1331 (11th Cir. 2004) (citations and internal quotation marks omitted).

Besides identifying these factors, the Supreme Court has offered guidance in how to use them.

First, the Supreme Court has described itself as having set forth only "some" of the relevant factors in evaluating whether application of the *Colorado River* doctrine is appropriate. *Moses H. Cone*, 460 U.S. at 15. In other words, the list of factors is not exhaustive—a fact further demonstrated by the Court's recognition of new factors in later cases. *See, e.g., Moses H. Cone*, 460 U.S. at 17 n.20.

Second, the Court has explained that we should not apply these factors mechanically in evaluating whether to grant a dismissal or stay of the federal action in favor of the parallel state action. *id.* at 16. Rather, the Court has emphasized that "[t]he weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Id.* And so we "careful[ly] balance[e] . . . the important factors as they apply in a given

case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Id.*

Taken together, this guidance reflects that the factors are intended to assist the court in assessing the ultimate question: whether, despite a court's "virtually unflagging obligation . . . to exercise the jurisdiction given" it, "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," nonetheless counsels in favor of dismissal or staying of the federal action in favor of the state one. *Colorado River*, 424 U.S. at 817. Indeed, as the Supreme Court later characterized it, the *Colorado River* doctrine recognizes the power of federal courts "to refrain from hearing . . . cases which are duplicative of a pending state proceeding." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996).

A court considering whether to stay or dismiss federal proceedings under the *Colorado River* doctrine must engage in a two-step analysis. *See Ambrosia Coal*, 368 F.3d at 1330-32. At the first step—the threshold—the court must satisfy itself that the federal and state litigation are parallel, a term in this context we have said means the "federal and state proceedings involve substantially the same parties and substantially the same issues." *Id.* at 1330, 1330 n.21. The proceedings need not be "[e]xact[ly] parallel[]," as long as they are substantially similar. *Id.* at 1330 n.21. If the federal and state proceedings cannot pass this test, the *Colorado River* doctrine cannot apply.

But if the federal and state proceedings are "substantially similar," the district court proceeds to step two. At that step, the

district court considers whether application of any factor or combination of factors supports the conclusion that the case is an "exceptional" one where "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation" warrants a stay or dismissal of the federal litigation in favor of the state litigation, despite the usual duty to exercise jurisdiction. *Moses H. Cone*, 460 U.S. at 14, 15; *see also Ambrosia Coal*, 368 F.3d at 1331.

When we apply *Colorado River*'s two-step process here, we conclude at the threshold step that the federal and state proceedings here are substantially similar. First, now that Foresters has been dismissed from the federal litigation, both the federal and state proceedings involve the same two parties: Cathleen and David. And second, the issues in both proceedings are also substantially similar: all that remains for the district court to do in the federal litigation is to resolve who, between Cathleen and David, gets what part or whole of the life-insurance proceeds, based on Sections 5 and 11 of the Agreement. And the State-Court Action will likewise effectively make the same determination when it evaluates Cathleen's child-support obligations to David under the very same paragraphs of the very same Agreement.

Any differences here between the federal and state litigation do not destroy the parallelism for purposes of the *Colorado River* analysis. Although the substantially similar issue arises in the context of different causes of action in the federal and state litigation, both cases nevertheless require the presiding court to determine Cathleen and David's rights and obligations concerning child

support under Sections 5 and 11 of the Agreement. Likewise, that the State-Court Action involves issues besides that in the federal litigation also does not matter for purposes of our analysis. Because the only issue remaining in the federal litigation is substantially similar to a significant issue in the State-Court Action, *Colorado River*'s requirement that the state and federal proceedings be parallel is satisfied here.

With that box checked, we proceed to *Colorado River*'s second step and assess the factors, weighing them against the usual strong obligation to exercise jurisdiction when it exists. In conducting this analysis, the district court concluded that a federal-court ruling in the case "would not settle the entire controversy" but would instead result in "piecemeal litigation." It also opined that the state court would sufficiently protect the rights of both Cathleen and David.

Besides that, we make three other observations.

First, the resolution of the federal litigation rests entirely on state law. Second and relatedly, in the context of this particular interpleader action, only the two adverse parties (Cathleen and David)—and not Foresters or any other party—are still in the case, and the sole remaining issue is how to award the money between Cathleen and David.

As our predecessor court has explained, "[i]nterpleader generally is a suit in equity which invokes equitable principles." *Fulton*

*v. Kaiser Steel Corp.*, 397 F.2d 580, 583 (5th Cir. 1968).[12] As a result, in evaluating the proper distribution of the life-insurance proceeds in federal court, the district court could (and likely should) properly consider not only the contractual language of the Agreement, but also any evidence concerning Cathleen's execution of her alleged duty to ensure David's receipt of child support.

That, of course, is the very gravamen of the State-Court Action. And the state court, which deals regularly in the family-dynamic aspects of domestic affairs, is uniquely well-equipped to resolve such a dispute—even more so here because the state court presided over the marital dissolution where the Agreement establishing Cathleen's and David's obligations and rights was ratified and adopted.

Third, the only remaining claim the adverse parties pled (before the district court stayed it) was Cathleen's declaratory-judgment claim against David. But as we have noted, the Declaratory Judgment Act endowed the district judge with discretion to decline to exercise jurisdiction over that claim, which it did by staying Cathleen's counterclaim against David. Indeed, the Supreme Court has characterized the Declaratory Judgment Act as having a "textual commitment" to "unique and substantial discretion" for the district court to entertain or not a claim under the Act. *Wilton*, 515 U.S. at 286-87. For that reason, the Court has explained that,

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit that were handed down before the close of business on September 30, 1981.

"[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id.* at 288.

Considering that the district court exercised its discretion to stay Cathleen's declaratory-judgment claim, our insistence that the district court nonetheless exercise jurisdiction to resolve essentially the same issue under its interpleader equity jurisdiction would create an end-run around Congress's grant of broad discretion under the Declaratory Judgment Act. We decline to do that. *Cf. Ambrosia Coal*, 368 F.3d at 1331 (noting that "[w]ithout question, the Supreme Court has . . . emphasized the importance of considering whether the concurrent cases involve a federal statute that evinces a policy favoring abstention").

In concluding that the district court did not abuse its discretion in staying the adverse federal proceeding in the interpleader action, we stress that (1) the same parties—and only the same parties—are involved in both proceedings; (2) the remaining issue in the federal proceeding is wholly effectively resolved by resolution of the state proceeding; (3) state law exclusively governs (in the domestic-relations area, which the state is uniquely well-equipped to handle); (4) the state court presided over the marriage-dissolution proceedings that adopted the Agreement at the heart of the dispute in both the state and federal proceedings; (5) parallel resolution of the child-support obligations and rights in the state and federal proceedings could result in conflicting rulings that would multiply the proceedings; and (6) under the particular circumstances here,

24                    Opinion of the Court                    20-14310

forcing the district court to exercise jurisdiction over the sole re-
maining issue in the interpleader action would undermine the De-
claratory Judgment Act's policy of endowing district courts with
discretion to decline to exercise jurisdiction. *See Moses H. Cone*,
460 U.S. at 16 (explaining that by far the most important factor in
the Court's decision to affirm dismissal of the federal action in favor
of the state action in *Colorado River* was the "clear federal policy"
of the McCarran Amendment (which consented to the joining of
the United States as a defendant in suits involving water-use rights)
to avoid piecemeal adjudication of water rights). For all these rea-
sons, the district court did not abuse its discretion when it con-
cluded that "considerations of practicality and wise judicial admin-
istration," *Wilton*, 515 U.S. at 288, justified its decision to stay the
federal proceedings until resolution of the State-Court Action.

### C. Balbin *does not require a different outcome*

Cathleen argues that the district court did not have the dis-
cretion to stay the federal proceedings because the litigation in the
district court began as an interpleader action. She asserts that every
interpleader action has two stages—one where the court deter-
mines whether interpleader is proper, and if it finds that it is, dis-
charges the plaintiff, and another where the court adjudicates the
competing claims to the stake at issue. Based on that understand-
ing of interpleader, Cathleen contends that the district court was
required to evaluate the competing claims to the proceeds as part
of exercising jurisdiction over Foresters's interpleader action.

Cathleen relies on our predecessor Court's decision in *Bos-
ton Old Colony Insurance Co. v. Balbin*, 591 F.2d 1040 (5th Cir.

20-14310                Opinion of the Court                25

1979). There, the Court applied what it described as "the general rule" and held that because the case involved no "important question[s] of the public policy of the State" or "unusual circumstances … based on comity," the district court could not decline to exercise properly invoked statutory interpleader jurisdiction. *Balbin*, 591 F.2d at 1044. According to Cathleen, *Balbin* stands for the proposition that district courts are "duty-bound to exercise interpleader jurisdiction." But we see at least four problems with Cathleen's argument that *Balbin* controls the outcome here.

For starters, we do not agree with Cathleen's reading of *Balbin* to the extent she contends *Balbin* unfailingly requires district courts to necessarily exercise interpleader jurisdiction over both steps of an interpleader action. Rather, *Balbin* stated the rule as follows: "if jurisdiction [was] properly invoked, it [is] the duty of the trial court to determine the issues *unless unusual circumstances triggered rules based on comity which would necessitate relegating the complaint to the state court*." *Id.* at 1044 (emphasis added). So even *Balbin* left open the option to decline jurisdiction under appropriate circumstances.

Second, the precedent *Balbin* concluded it was bound by—*Maryland Casualty Co. v. Glassell-Taylor & Robinson*, 156 F.2d 519 (5th Cir. 1946)—was decided before the Supreme Court issued *Moses H. Cone*, which clarified the *Colorado River* doctrine. Not only that, but *Balbin* did not even mention *Colorado River* or consider its potential impact on the rule from *Maryland Casualty Co.*, in the first place. *Moses H. Cone* and other *Colorado River* progeny that postdated *Balbin* elaborated on the "exceptional" circumstances

that can warrant a district court's decision to stay or dismiss a federal action or claim while parallel state litigation proceeds. *See*, *e.g.*, *Moses H.* Cone, 460 U.S. at 15-16. So to the extent that *Balbin* can be understood to have constricted the circumstances under which a district court may decline to exercise jurisdiction to a more limited universe than *Colorado River*'s progeny later sanctioned, *Moses H. Cone* abrogated it.

Third, independently, *Quackenbush v. Allstate Insurance Co.*, 517 U.S. 706 (1996), likewise abrogated *Maryland Casualty* and *Balbin* to the extent that those cases did not recognize an exception, based on equity (in which interpleader has its roots), to the general rule requiring courts to exercise their jurisdiction. *See Balbin*, 591 F.2d at 1044. *Quackenbush* explained that *Colorado River*, among other similar doctrines, "reflects the common-law background against which the statutes conferring jurisdiction were enacted." 517 U.S. at 717 (cleaned up). And that common-law background shows that "it has long been established that a federal court has the authority to decline to exercise its jurisdiction when it is asked to employ its historic powers as a court of equity." *Id.* (cleaned up). As the Supreme Court noted, "[t]his tradition informs our understanding of the jurisdiction Congress has conferred upon the federal courts, and explains the development of [among other doctrines, that of *Colorado River*]." *Id.* To the extent that *Balbin* purports to preclude declination to exercise jurisdiction in equity actions like interpleader, then, that aspect of it is no longer good law.

And finally, some critical differences between *Balbin* and *Maryland Casualty*, on the one hand, and the case here, on the

other, render both *Balbin's* and *Maryland Casualty's* reasoning inapplicable. *Balbin* and *Maryland Casualty* were both what have been known as "actions in the nature of interpleader." *See State of Texas v. State of Florida*, 306 U.S. 398, 406-07 (1939). That is, the plaintiff in each case continued to assert an interest in the money deposited with the court. *See id.* Here, though, Foresters filed a "strict bill of interpleader," meaning it claimed no interest in the funds it deposited with the district court. *See id.* Plus, unlike in *Balbin* and *Maryland Casualty*, the stakeholder here (Foresters) has not been subject to—and given its deposit of the funds with the district court and its dismissal from the interpleader action—will not in the future be subject to, any other actions relating to the deposited life-insurance monies.

These factual circumstances of *Balbin* and *Maryland Casualty*, which do not exist here, drove the logic behind the rule from those cases. In *Maryland Casualty*, the court reasoned that § 1335 and Rule 22 were designed to accomplish several purposes. 156 F.2d at 523-24. It explained that the interpleader procedures were intended "to prevent a multiplicity of suits and to protect the stakeholder from multiple liability." *Id.* at 523. But here, of course, neither of those things is a concern because Foresters was a disinterested stakeholder and has been dismissed from the action and further liability, and the only two parties—Cathleen and David—to make adverse claims to the stake are engaged in litigation elsewhere that will adjudicate those claims.

The *Maryland Casualty* court also noted that Congress sought through the interpleader statute and rule "to require all

interested parties to come in and set up their claims in one case, so as to prevent it from being only a race to the swift, where a creditor who had a large claim and the means by which to prosecute it might promptly secure judgment against the stakeholder in another state, and by a prior execution consume the entire amount of the bond, to the exclusion and detriment of creditors having small claims or inadequate means by which to collect them." *Id.* Again, though, that is not an issue here. Both Cathleen and David seek to resolve their adverse claims in Florida (though in different courts), and both are parties to the federal and state litigation. So neither can exhaust the stake here without a court's order entitling one of them to the monies after hearing and considering argument from the other as well.

Besides these purposes, the *Maryland Casualty* court described § 1335 as having been "designed to afford a means of process by which claimants to a fund, who live in other states, may be called in and required to litigate in one court to the end that all claimants to the fund, as well as the holder of the fund, may be given protection." *Id.* at 523-24. But once again, here, that is no concern: though David resides in Michigan, he chose to file the State-Court Action in Florida, and both he and Cathleen—the only claimants to the fund—are parties to both the federal case and the State-Court Action. So none of the reasons for the *Balbin/Maryland Casualty* rule, particular to interpleader actions, applies here.

For all these reasons, *Balbin* did not strictly require the district court to exercise jurisdiction on the adverse claim in the interpleader action while the State-Court Action proceeds.

## IV.

The district court did not abuse its discretion when it decided to stay the interpleader action while the State-Court Action resolves. We therefore affirm.

**AFFIRMED.**